# In the Matter Of:

## WBY vs Bell

## 30(b)(6) Steven Youngelson

*April 11, 2019*



934 Glenwood Ave SE
Suite 250
Atlanta, GA 30316
885.478.7376

Page 1

```
 1              UNITED STATES BANKRUPTCY COURT
                NORTHERN DISTRICT OF GEORGIA
 2                    ATLANTA, GEORGIA

 3

 4    IN RE:                          )
      WBY, INC., d/b/a FOLLIES        )
 5            Debtor                  )
                                      )        CHAPTER 11
 6    _____)

      WBY, INC.,                      )
 7                                    )   CASE NO. 16-52291-JRS
              Objector,               )
 8                                    )
           vs.                        )
 9                                    )
      CYDNEY BELL, et al.,            )        VOLUME I
10                                    )
              Claimants.              )     (PAGES 1 - 235)
11

12

13         30(B(6) DEPOSITION OF WBY, INC.

14         WITNESS: STEVEN M. YOUNGELSON

15                  April 11, 2019

16                    10:23 a.m.

17         Bryan Cave Leighton Paisner LLP

18              One Atlantic Center

19           1201 West Peachtree Street

20                 Fourteenth Floor

21             Atlanta, Georgia  30309

22

23   Reported By: Judith L. Leitz Moran, RPR, RSA,

24           Certified Court Reporter CCR-B-2312

25                    Job No 206
```



Page 2

```
 1   APPEARANCES:
 2
 3   on behalf of Steven M. Youngelson and Surrey White:
 4        JASON J. DEJONKER, ESQUIRE
 5        BRYAN CAVE LEIGHTON PAISNER LLP
 6        161 North Clark Street
 7        Suite 4300
 8        Chicago, Illinois  60601
 9
10   On behalf of WBY, Inc., Steven M. Youngelson and
11   Surrey White:
12        ERICA V. MASON, ESQUIRE
13        CONSTANGY, BROOKS, SMITH & PROPHETE LLP
14        230 Peachtree Street, N.W.
15        Suite 2400
16        Atlanta, Georgia  30303
17
18   On behalf of the Claimants:
19        AINSWORTH DUDLEY, ESQUIRE
20        DUDLEY LLC
21        4200 Northside Parkway Building 1
22        Suite 200
23        Atlanta, Georgia  30327
24
25
```

Page 3

```
 1   APPEARANCES (CONT.)
 2
 3   On behalf of the Claimants (Cont.):
 4        LEON S. JONES, ESQUIRE
 5        JONES & WALDEN, LLC
 6        21 Eighth Street NE
 7        Atlanta, Georgia  30309
 8
 9   Observer on behalf of Brezzy Hurst:
10        MATTHEW W. HERRINGTON, ESQUIRE
11        DELONG, CALDWELL, BRIDGERS,
12        FITZPATRICK & BENJAMIN, LLC
13        3100 Centennial Tower
14        101 Marietta Street
15        Atlanta, Georgia  30303
16
17   ALSO PRESENT:
18        SURREY WHITE
19
20
21
22
23
24
25
```

Page 4

```
 1   INDEX OF EXAMINATION                       PAGE
 2        DISCUSSIONS OF COUNSEL ...............   5
 3        BY MR. DUDLEY ........................  32
 4
 5
 6              E X H I B I T S
 7   EXHIBIT NO.                                PAGE
 8   Exhibit 1   Spreadsheet - In Re: WBY        190
 9               Bankruptcy Matter
10               Confidential
11   Exhibit 2   Spreadsheets - Attachment A     202
12               Class C Estimated Claims -
13               10/11/13 - Present (5/01/19);
14               Follies Class C Estimated
15               Claims - 02/06/13 through
16               10/10/13
17
```

Page 5

```
 1           (WHEREUPON, the deposition proceeding
 2   began at 10:23 a.m., as follows:)
 3           MR. DUDLEY:  Let's go on the record.
 4           This is the 30(b)(6) deposition of WBY,
 5   Inc., doing business as Follies.
 6           The deposition is used for purposes of
 7   estimating claims pursuant to the Debtor's motion
 8   to estimate claims.
 9           The testimony will be limited to the
10   estimation of claims.
11           Could you swear in the witness, please?
12           MS. MASON:  Before we do that, should we
13   make appearances?  Do you want to do that?
14           MR. DUDLEY:  That's fine.  I don't care.
15   However you want to do it.
16           MS. MASON:  Okay.  Jason.
17           MR. DEJONKER:  I don't care.  Why don't
18   we do appearances, that's fine.
19           Jason Dejonker, Bryan Cave Leighton
20   Paisner on behalf of Mr. Youngelson and Mr. White.
21           MS. MASON:  Erica Mason, Constangy,
22   Brooks, Smith & Prophete, on behalf of WBY, Inc.,
23   Mr. Youngelson and Mr. White.
24           THE COURT REPORTER:  Please raise your
25   right hand.
```



Page 74

1  is standard in the restaurant business for
2  waitresses to tip bar staff?
3       A    I believe so.
4            MS. MASON: Object to form. This is
5  outside the scope of the notice.
6       A    I believe so. But it's outside of this
7  anyway, but I believe so.
8  BY MR. DUDLEY:
9       Q    Okay. And would you say it's standard in
10 the adult entertainment industry for an adult
11 entertainer to tip bar staff?
12      A    I have no idea.
13      Q    And would you say it's standard in the
14 industry for -- obviously for bar staff to be
15 tipped by customers?
16      A    I know when I go to a bar, I tip a
17 bartender when I buy a drink. I assume other
18 people do, too.
19      Q    Now, does the bar staff pay Follies a fee
20 each shift?
21      A    Not that I know of.
22      Q    Have you asked to see if that is done?
23      A    I don't believe --
24           MS. MASON: Object to form. Outside the
25 scope of notice.

Page 75

1       A    I believe they do not.
2  BY MR. DUDLEY:
3       Q    Okay.
4       A    That's my best belief on it.
5       Q    All right. Follies has a business model
6  that to me has a couple of characteristics. And
7  one would be that it treats its waitresses and
8  entertainers as independent contractors, correct?
9            MS. MASON: Object to the form. We're
10 not here to talk about waitresses.
11           THE WITNESS: Answer it?
12           MS. MASON: You can answer as to
13 entertainers.
14           MR. DUDLEY: I beg to --
15      A    I believe we do.
16           MR. DUDLEY: Hold on.
17           I beg to differ with you. We are --
18 waitresses are part of Class C, and we are very
19 much here to get into waitresses.
20           MS. MASON: I'll allow that question.
21           MR. DUDLEY: Well, thank you for that.
22           Could you please read my question back?
23      A    I answered it, though.
24           MR. DUDLEY: Read it back, please.
25           (Whereupon, the requested portion of

Page 76

1            the record was read by the reporter.)
2       A    I said I believe so.
3  BY MR. DUDLEY:
4       Q    You believe so or you know so?
5       A    I know so.
6       Q    Okay. And why is that done?
7       A    It was set up when we -- when we opened
8  the place and I wasn't involved at all and just
9  continued it. And I've heard nobody complain.
10      Q    You would agree with the statement that
11 it saves Follies money to characterize entertainers
12 and waitresses as independent contractors because
13 you don't have to worry about FICA and all the
14 other taxes associated with employment, correct?
15           MS. MASON: Object to form, compound. If
16 you're going to ask questions about waitresses,
17 they need to be separated out from entertainers.
18 They're separate groups.
19      A    As far as my entertainers --
20           MR. DUDLEY: I disagree with you totally.
21           MS. MASON: Well --
22      A    As far as my entertainers go, if they
23 were salary employees, they would never come back
24 to work because they wouldn't make near the money
25 that they're making. They make a lot more money

Page 77

1  being independent contractors.
2            Because if they were salaried employees,
3  the fees that we -- that the club suggests for a
4  $10 table dance, a hundred dollars in the VIP would
5  be my money because they're working for me.
6            When I worked at a shoe store when I was
7  in high school, every time I sold a pair of shoes,
8  I'd go to the cash register and put it in. These
9  people -- I don't get paid. These people, if they
10 were getting paid minimum wage or any type of
11 salary, that would be my money. The tips are
12 always their money.
13 BY MR. DUDLEY:
14      Q    Okay.
15           MR. DUDLEY: Could you read my question
16 back, please.
17           (Whereupon, the requested portion of
18           the record was read by the reporter.)
19           MS. MASON: Object to the form, asked and
20 answered.
21      A    My answer to that question is, it doesn't
22 save us any money. If -- if they were salaried, it
23 would cost us a lot of money and it would cost them
24 a lot of money.
25 BY MR. DUDLEY:

Page 86

1  some language that I don't want to use here, but
2  you're my employee.
3    Q    But let me just ask you a question about
4  choice. Do you understand that the Fair Labor
5  Standards Act determines whether an entertainer or
6  a waitress is an employee rather than their choice?
7         MS. MASON: Object to form. Compound.
8    A    I'm not sure to be honest with you. I'm
9  not -- you know, I was a lawyer for -- before you
10 were a lawyer, but I didn't do this. I'm learning
11 this as I'm going about labor law and stuff.
12        I know one of the questions I've always
13 had is there are clubs that -- and I used to own
14 part of the Punchline Comedy Club. They're
15 entertainers, they didn't get paid a salary, a
16 minimum wage, the comics.
17        I know a lot of clubs around the country.
18 I know about all of these lawsuits because, you
19 know, I've been involved in FALA, First Amendment
20 Lawyers Association.
21        And there's -- a lot of clubs have, and
22 we specifically built ours where we didn't have
23 them, because one thing about them is feature acts
24 that come around, where the feature act is doing
25 things the other girls aren't that are making me

Page 87

1  money. That's why we have a horseshoe-type stage
2  so we can't get tempted to do that.
3         And the question is, I know everybody
4  said you can have a feature. Well, how many
5  features can I have that are independent? You
6  know, so no one's ever answered that question. Can
7  I have 30, can I have 40, you know. So I'm not
8  quite sure exactly where the breakdown is on how
9  you determine.
10 BY MR. DUDLEY:
11   Q    But you do understand that the -- whether
12 somebody's an employee or an independent contractor
13 with respect to an entertainer is based upon the
14 economic realities test, you understand that?
15   A    No, I think -- see, I've read a million
16 cases and to me the biggest criteria is control.
17 That's my opinion.
18   Q    All right. But that --
19   A    You might have a different one.
20   Q    That's a factor in the economic realities
21 test, isn't it?
22   A    Okay. Well, we have no control.
23   Q    But you would agree that that's one of
24 six factors in the economic realities test?
25   A    Yeah, but I don't understand them all.

Page 88

1    Q    Okay.
2    A    I mean, to me -- I read decisions and
3  like I know certain clubs got sued and lost if you
4  -- your best shifts are Saturday and Friday nights.
5  If the girl wants to work Saturday or Friday night,
6  they got to work Monday and Tuesday. If you worked
7  at our club today, you can come back six months
8  later, it doesn't matter.
9    Q    Have you made efforts to know and
10 understand the other five factors of the economic
11 realities test?
12   A    I don't -- I can't give them to you off
13 the top of my head. I'm confused on the one that
14 who need two more.
15   Q    Well, I'm just simply asking you whether
16 you've investigated --
17   A    Yeah, I have a general idea, but I -- I'm
18 not going to be able to write a brief on it.
19   Q    Okay. And that's through your research
20 of the matter?
21   A    I got it from one of these -- when these
22 cases started, I started looking at Dru, one of my
23 old partners, Carey, and he would send me cases and
24 he'd go to the FALA conventions and everything --
25 that's First Amendment Lawyers Association

Page 89

1  convention -- because I don't do it anymore. And
2  give me -- and give me the -- everybody's ideaers.
3  And I tried to set -- I tried to model my club
4  accordingly.
5    Q    Okay. All right. Well, we'll come back
6  to all of that, but I want to go back to your
7  business model.
8         The one aspect of your business model at
9  Follies is to classify entertainers and waitresses
10 as independent contractors. We've been through
11 that one.
12        Another aspect of your business model at
13 Follies is to not pay waitresses and entertainers'
14 wages, correct?
15        MS. MASON: Object to form. Compound.
16   A    That's correct.
17 BY MR. DUDLEY:
18   Q    All right. And then a third aspect of
19 your business model at Follies with respect to
20 entertainers and waitresses is that they work for
21 tips only, correct?
22        MS. MASON: Object to form. Compound.
23   A    Yeah, I imagine if I'm not paying them.
24 BY MR. DUDLEY:
25   Q    Okay. And then the -- what I would call

Page 90

the fourth aspect of your business model at Follies is that Follies requires the entertainers to pay to work, correct?

MS. MASON: Object to form.

A   No, I don't believe so. Part of that house fee is to have a locker. And they use a lot of our makeup that the house moms use and everything.

Do they pay a house fee, yes. They don't pay to work. And that's as good as I'm going to break it down to you.

BY MR. DUDLEY:

Q   Okay. Well, then I have to break it down, because they are required to pay a house fee to work each shift?

A   Sometimes they don't.

Q   Not what I'm asking you. Is it Follies' policy, practice and procedure to require --

A   They get a house fee.

Q   -- an entertainer to pay a house fee to work each shift?

A   Yes.

Q   Okay. I understand that like any type of business, you may make exceptions if somebody's having a rough time, for example; is that correct?

Page 91

A   Yeah, but they also get free food, like at the buffet and stuff.

Q   I understand there may be some other benefits of employment, although, I haven't been provided with them. But if that's your position, I would lose it.

All right. And they are required to pay the DJ?

A   Not that I know of. It's not -- house fee you can say it's as mandatory as it gets. Tip outs are not mandatory, period.

Q   Okay. Well --

A   Will the DJ hassle somebody to get paid? Yeah, if there was a problem, if the girl came to me, I'd straighten it out.

Q   And what would you do?

A   She doesn't have it, leave her alone, it's not a requirement.

Q   Okay. And have you done that?

A   No, because no girl's ever come to me and told me that.

Q   Okay. But you would agree -- and for purposes of this, I don't make a distinction between a tip out and fee. To me it's all the same thing. So when I refer to one or the other, I'm

Page 92

just talking about a payment made by somebody.

A   Well, time out. I understand what you're saying. I make a big distinction between my house fee and non-mandatory tip out.

Q   All right. Well, we've talked about house fees. We'll deal with the rest of it.

You consider the DJ to be a tip out, the payment made by an entertainer to the DJ?

A   I haven't -- yes.

Q   All right.

A   They tip him if they want to. They get -- we're one of the only clubs that I know of that the girls pick their own music. A lot of times you dance to whatever -- the way I understand.

Q   We'll get into later these distinctions between the clubs.

A   Okay.

Q   Right now I simply want to know --

A   I imagine --

Q   -- whether this is part of the business model.

MS. MASON: Object to form, vague.

A   If I had to write my business model down, what I'd do, I would not say that tipping out is part of my model.

Page 93

BY MR. DUDLEY:

Q   Okay. Well, would you agree with this statement and let me finish it. The girls -- and when I say "girls," I'm referring to entertainers and waitresses -- well, in this case I'm not referring to waitresses because --

A   Right.

Q   -- we're talking about DJs.

But the entertainers typically pay the DJ. And the amounts the entertainers typically pay the DJ is either greater of $10 or 10 percent of their earnings; is that correct?

A   No.

Q   That's not correct?

A   That -- to my knowledge, no, because I --

Q   What's wrong with that?

A   I've seen the list. I've looked at a couple of them. Some girls tip four or five dollars, six dollars.

Q   I will go back. We all agree that there are some circumstances where there are exceptions to the rule where a dancer doesn't make much money and she may not be required to tip, but I'm talking in the typical situation. And you've given me the DJ sheets.

Page 230

1    MS. MASON: Object to form.
2    A    You're asking me -- I don't have it in
3    front of me. All I know is I calculated from --
4    from our information.
5        MS. MASON: He's asking you a question
6    and you've answered it.
7    A    Yeah, I don't agree with these numbers
8    because I calculated about $180,000 from the
9    information that I looked at, and I think that's a
10   lot less than you guys calculate.
11       And now granted, I didn't calculate tip
12   outs.
13   BY MR. DUDLEY:
14   Q    Where did you come up with that number --
15   A    I looked --
16   Q    -- the $180,000 number?
17   A    I looked at -- I didn't calculate tip
18   outs in there or anything, just plain hours, okay?
19   I looked at the girls' shifts that they worked,
20   that they signed in on, which we have records for.
21   I gave them the benefit of the doubt that they
22   worked eight hours. And a lot of them were lying
23   on the floor in the dressing room. Not all of
24   them. They drank too much, you know, and they're
25   lying down for two, three hours. I even included

Page 231

1    that time and multiplied the hours that I looked at
2    by 7.25 and came up with about 183,000. That's how
3    I came up with it. I mean, which is far cry from
4    what you came up with.
5    Q    And you looked at your DJ sign-in sheets
6    to come up with that?
7    A    Yes.
8    Q    And that's the figure you came up with?
9    A    Yes, sir.
10   Q    Okay.
11   A    And if I'm wrong, I'm wrong.
12   Q    I want to ask you about Ms. Barker.
13   A    I don't even know who she is.
14   Q    Ms. Barker worked for Follies for seven
15   years.
16   A    I have no idea who it is. So you can ask
17   me all about her.
18   Q    Okay.
19   A    In other words, if three people came in
20   and you said pick out Ms. Barker and you get a
21   thousand dollars, it'd be a guess, okay?
22       She works at night, right? Does she work
23   at night?
24   Q    If you don't know Ms. Barker, you don't
25   know Ms. Barker.

Page 232

1    A    I'm not there at night.
2        MS. MASON: Are you asking if he knows
3    who she is as a person?
4        MR. DUDLEY: He doesn't know her.
5        MS. MASON: No, I agree.
6    A    And that's totally honest. Everything I
7    say is totally honest, but this is even more
8    honest. I have no idea who that is.
9        MR. DUDLEY: We can stop now or we can
10   plow through some more and get as much done. It's
11   up to you guys.
12       THE WITNESS: Well, I'm going to tell
13   you, I've about had it to be honest with you.
14       MR. DUDLEY: That's fine.
15       THE WITNESS: And I'm going to tell
16   you --
17       MR. DEJONKER: Let's go off the record,
18   please.
19       MR. DUDLEY: We're off.
20       (Off the record.)
21       (Deposition adjourned at 3:15 p.m.)
22       (Signature not requested.)
23
24
25

Page 233

1            C E R T I F I C A T E
2    STATE OF GEORGIA:
3    COUNTY OF DEKALB:
4
5        I hereby certify that the
6    foregoing transcript was taken down, as
7    stated in the caption, and the questions
8    and answers thereto were reduced to
9    typewriting under my direction; that the
10   foregoing Pages 1 through 232 represent a
11   true and correct transcript of the
12   evidence given upon said hearing, and I
13   further certify that I am not of kin or
14   counsel to the parties in the case; am not
15   in the regular employ of counsel for any
16   of said parties; nor am I in anywise
17   interested in the result of said case.
18       The witness did reserve the right
19   to read and sign the transcript.
20       This, the 22nd day of April 2019.
21
22
         _____
         Judith L. Leitz Moran, CCR-B-2312
23       Certified Court Reporter
24
25   Job No. 206

Page 234

```
 1                    DISCLOSURE
 2
 3        Pursuant to Article 10.B of the Rules and
    Regulations of the Board of Court Reporting of the
 4  Judicial Council of Georgia, I make the following
    disclosure:
 5
          I am a Georgia Certified Court Reporter.  I am
 6  here as a representative of IST Reporting.
 7        I am not disqualified for a relationship of
    interest under the provisions of O.C.G.A.
 8  9-11-28(c).
 9        I was contacted by the office of IST Reporting
    to provide court reporting services for this
10  deposition.
11        I will not be taking this deposition under any
    contract that is prohibited by O.C.G.A. Section
12  15-14-37 (a) and (b).
13        I have no exclusive contract to provide
    reporting services with any party to the case, any
14  counsel in the case, or any reporter or reporting
    agency from whom a referral might have been made to
15  cover this deposition.
16        I will charge my usual and customary rates to
    all parties in the case, and a financial discount
17  will not be given to any party to this litigation.
18
19        This, the 22nd day of April 2019.
20
21
22        _____
          Judith L. Leitz Moran, CCR-B-2312
23        Certified Court Reporter
24
25  Job No. 206
```

Page 235

```
 1                 DISCLOSURE OF FIRM
 2
 3        I, IST Reporting, do hereby disclose pursuant
    to Article 10.B. of the Rules and Regulations of
 4  the Board of Court Reporting of the Judicial
    Council of Georgia that IST Reporting was contacted
 5  by Bryan Cave Leighton Paisner LLP, to provide
    court reporting services for this deposition and
 6  there is no contract that is prohibited by O.C.G.A.
    15-14-37(a) and (b) or Article 7.C. of the Rules
 7  and Regulations of the Board for the taking of this
    deposition.
 8
          There is no contract to provide reporting
 9  services between IST Reporting or any person with
    whom IST Reporting has a principal and agency
10  relationship nor any attorney at law in this
    action, party to this action, party having a
11  financial interest in this action, or agent for an
    attorney at law in this action, party to this
12  action, or party having a financial interest in
    this action.  Any and all financial arrangements
13  beyond our usual and customary rates have been
    disclosed and offered to all parties.
14
15        This, the 22nd day of April 2019.
16
17
18        _____
19
          FIRM REPRESENTATIVE
20        IST REPORTING
21
22
23
24
25  Job No. 206
```

