**In the Matter Of:**

WBY vs Bell

---

**3)(b)(6) Surrey White**

*April 11, 2019*

---



934 Glenwood Ave SE
Suite 250
Atlanta, GA 30316
885.478.7376

Page 1

```
 1              UNITED STATES BANKRUPTCY COURT
                NORTHERN DISTRICT OF GEORGIA
 2                    ATLANTA, GEORGIA

 3

 4    IN RE:                        )
      WBY, INC., d/b/a FOLLIES )
 5           Debtor               )
                                   )         CHAPTER 11
 6    _____ )

      WBY, INC.,                    )
 7                                  )    CASE NO. 16-52291-JRS
             Objector,             )
 8                                  )
                                   )
         vs.                       )
 9                                  )
      CYDNEY BELL, et al.,         )
10                                  )
             Claimants.           )
11

12

13         30(B)(6) DEPOSITION OF WBY, INC.

14           WITNESS: SURREY WHITE

15               April 11, 2019

16                4:09 p.m.

17      Bryan Cave Leighton Paisner LLP

18           One Atlantic Center

19        1201 West Peachtree Street

20             Fourteenth Floor

21        Atlanta, Georgia   30309

22

23    Reported By: Judith L. Leitz Moran, RPR, RSA,

24           Certified Court Reporter CCR-B-2312

25               Job No. 206
```

Page 2

```
 1   APPEARANCES:
 2
 3   on behalf of Steven M. Youngelson and Surrey White:
 4        JASON J. DEJONKER, ESQUIRE
 5        BRYAN CAVE LEIGHTON PAISNER LLP
 6        161 North Clark Street
 7        Suite 4300
 8        Chicago, Illinois  60601
 9
10   On behalf of WBY, Inc., Steven M. Youngelson and
11   Surrey White:
12        ERICA V. MASON, ESQUIRE
13        CONSTANGY, BROOKS, SMITH & PROPHETE LLP
14        230 Peachtree Street, N.W.
15        Suite 2400
16        Atlanta, Georgia  30303
17
18   On behalf of the Claimants:
19        AINSWORTH DUDLEY, ESQUIRE
20        DUDLEY LLC
21        4200 Northside Parkway Building 1
22        Suite 200
23        Atlanta, Georgia  30327
24
25
```

Page 3

```
 1   APPEARANCES (CONT.)
 2
 3   On behalf of the Claimants (Cont.):
 4        LEON S. JONES, ESQUIRE
 5        JONES & WALDEN, LLC
 6        21 Eighth Street NE
 7        Atlanta, Georgia  30309
 8
 9
10
11   INDEX OF EXAMINATION                    PAGE
12        BY MR. DUDLEY ........................   4
13        BY MS. MASON .........................  67
14        BY MR. DUDLEY ........................  77
15        BY MS. MASON .........................  85
16        BY MR. DUDLEY ........................  86
17
18
19
20            E X H I B I T S
21        (No exhibits marked.)
22
23
24
25
```

Page 4

```
 1                SURREY WHITE,
 2   being first duly sworn, was examined as follows:
 3            THE WITNESS:  Yes.
 4               EXAMINATION
 5   BY MR. DUDLEY:
 6        Q    Mr. White, we met before -- I don't think
 7   I took your deposition before, did I?
 8        A    I don't think so.  You nailed me pretty
 9   good at the hearing, in the bankruptcy hearing.
10        Q    That was probably my --
11        A    I believe it was.
12        Q    -- associate over here (indicating).
13        A    You guys look alike, so I don't know.
14        Q    You understand that you're here for
15   purposes of testifying about evidence that may be
16   relevant in a motion to estimate the value of the
17   entertainers' claims in this bankruptcy case?
18        A    Yes, yes.
19        Q    Okay.  You understand that those same
20   dancers have claims in the U.S. District Court?
21        A    Pardon me?
22        Q    You understand that those same dancers
23   have claims in the U.S. District Court?
24        A    Yes.
25        Q    Okay.  All right.  And you understand
```

Page 5

```
 1   that I represent claimants who are in three
 2   different lawsuits, correct?
 3        A    Right, yes.
 4        Q    Okay.  What is your position with
 5   Follies?
 6        A    I used to run the place years ago, but
 7   I've been retired for almost 11 years now.  I don't
 8   even live in Atlanta but six months out of the
 9   year.  So I really don't have much to do with it
10   anymore.
11        Q    All right.  Well, okay, what did you do
12   between -- was it 1990 when Follies was started or
13   1993?
14        A    I think it was '91.
15        Q    Between 1991 and until you retired about
16   11 years ago, tell me what you did for Follies.
17        A    Actually, I just oversaw management more
18   than anything else and just made sure the books
19   were correct and the money got in the right place,
20   the roof wasn't falling in, you know, that sort of
21   thing.  Just overall overseeing.
22        Q    Would it be a true statement to say you
23   were more involved in the operation side of it?
24        A    Very true.
25        Q    Okay.  And you had had some experience, I
```

**Page 10**

1  were involved in the DoL investigation and
2  settlement of claims against the clubs.
3      A    I don't know.  I really don't know.
4      Q    Okay.  But you don't -- you don't
5  recognize his name, Scott Schulten, and you don't
6  remember him representing Follies?
7      A    I do not.  I do not.
8      Q    What other attorneys have represented
9  Follies over the years?
10     A    These guys (indicating).
11     Q    All right.  You're referring to Erica
12 Mason?
13     A    Erica and Jason, yes.
14     Q    Okay.
15     A    Steve always handled that part of it.  If
16 there was any legal stuff needed to be dealt with,
17 he always dealt with that.
18     Q    Okay.
19     A    If there was something I needed to know,
20 he would tell me, otherwise, I would just go on
21 about his business.
22     Q    Okay.  All right.  Well, let's talk about
23 Follies' operations.  They have always employed --
24 and if you rather me use a word "adult
25 entertainers" -- always worked at Follies, I'll be

**Page 11**

1  happy to do that.  It's always been a part of their
2  business model to have adult entertainers work at
3  Follies, correct?
4      A    Yes.
5      Q    And Follies, although, it serves alcohol
6  and food, you would agree that they -- the primary
7  purpose is to be an adult entertainment club; is
8  that right?
9      A    Nude dancers.
10     Q    What's that?
11     A    Nude dancers.
12     Q    That's why people come.
13     A    I would think so.
14     Q    Yeah.
15          Now, since you were there, were adult
16 entertainers always classified as independent
17 contractors?
18     A    It's been that way since I ever heard
19 about the business getting started.
20     Q    Okay.
21     A    I mean, I don't know about nationwide,
22 but I know it has been around Atlanta.
23     Q    And that's what Follies has done from the
24 beginning all the way to the --
25     A    From day one, yes.

**Page 12**

1      Q    All right.  Did they always treat
2  waitresses as independent contractors?
3      A    Back in the early days, I think -- we
4  didn't even have any waitresses.  I had like 10
5  dancers the first couple of years we were open.  We
6  were struggling.
7      Q    Yeah.
8      A    There were so many and we were fighting
9  the county anyway.  So I think mostly -- most of
10 the time we didn't even have a waitress, we just
11 let a dancer do the waiting and the dancing.
12     Q    Okay.
13     A    Because, I mean, we didn't have that many
14 customers.  We struggled for a while.
15     Q    So the -- so the entertainers who were
16 also waitressing would have been independent
17 contractors?
18     A    Yes.
19     Q    Okay.  And then another part -- and
20 that's a business model that -- you may have
21 struggled in the beginning -- but that's a business
22 model that has been -- it's been financially
23 successful for Follies for going on now, what, 25
24 years, 30 years?
25     A    Probably so, yes.

**Page 13**

1      Q    And as part of that business model,
2  Follies does not pay wages to the entertainers or
3  waitresses, correct?
4      A    No, we do not.
5      Q    All right.  And the waitresses and
6  entertainers work for tips only; is that correct?
7      A    That's correct.
8      Q    Okay.  And the way the entertainers make
9  money is they do table dances, stage dances, VIP
10 dances and entertaining in either the VIP or -- or
11 other places in the club, correct?
12     A    Conversation, anything, yes.
13     Q    Okay.  Some men will pay for
14 conversation?
15     A    Oh, they will.
16     Q    All right.
17     A    Good conversation will make you more
18 money than a good looking body, believe me.
19     Q    Yeah.
20     A    That's fact.  A lot of men have problems.
21     Q    Yeah.
22          Okay.  And those are payments that are
23 made by the customer directly to the entertainer,
24 correct?
25     A    Yes.

WBY vs Bell                          3)(b)(6) Surrey White                          04/11/2019

---

Page 14

1  Q    And Follies is a cash business and
2  they've never kept records of the amount of dances
3  or VIP sessions that a -- that an entertainer might
4  have with a customer, correct?
5  A    We don't know what they make, no.
6  Q    And all earnings they make, regardless of
7  what it is at the club, is a transaction between
8  the customer and the adult entertainer?
9  A    Right.
10 Q    It's in cash and Follies doesn't have
11 anything to do with it?
12 A    Nothing.
13 Q    Okay.  And then another aspect of the
14 business model has been that the entertainers pay
15 to work; is that correct?
16 A    We call it a locker fee.
17 Q    Okay.  And that's an amount of money that
18 goes to Follies?
19 A    Goes where?
20 Q    That's an amount that the girls pay to
21 Follies in cash at the beginning of their shift?
22 A    At the beginning of the shift, yeah.
23 Q    Or the end of the shift?
24 A    Right.
25 Q    That's done for every shift they work,

---

Page 15

1  correct?
2  A    Correct.
3  Q    And then they also pay the DJ a certain
4  amount of money each shift; is that correct?
5  A    It's a tip out money.
6        MS. MASON:  Object to form.
7  BY MR. DUDLEY:
8  Q    It's a question, you tip out?
9  A    They tip out.
10 Q    All right.  So the entertainers tip out a
11 certain amount to the DJ each shift?
12 A    I'm not sure.
13       MS. MASON:  Object to form, assumes facts
14 not in evidence.
15 A    I'm not sure what the amount is, but I
16 think do --
17 BY MR. DUDLEY:
18 Q    But they do --
19 A    -- some industry kind of standard thing.
20 Q    Okay.  It's something that you don't
21 agree was required by the entertainer, but you
22 acknowledge it happened?
23 A    Yeah, I think it probably does, yes.
24 Q    And the reason why I'm saying this is
25 because at least -- and it probably was done the

---

Page 16

1  same way at Follies South, right?
2  A    It was done the same way ever since I've
3  been in this business.  I've been in it 40 years.
4  Q    Okay.  All right.  And then the
5  entertainers also at Follies would pay tip outs to
6  house moms and floormen and valets and bar staff,
7  correct?
8        MS. MASON:  Object to form, assumes facts
9  not in evidence.
10 A    I'm not sure about all of those people.
11 I think there's some money that gets exchanged
12 around.  People that service each other, like the
13 bartenders and the waitresses and this sort of
14 thing, they may get tip outs, but I don't know
15 about all these other people.  I'm not sure about
16 that.
17 BY MR. DUDLEY:
18 Q    All right.  So your testimony would be
19 that an entertainer is not expected to tip out to
20 the house mom each shift?
21 A    Well, she -- they're not required to tip
22 anybody if they don't want to.  I think it's just
23 an industry standard.
24 Q    Okay.  Are they expected to tip the house
25 mom?

---

Page 17

1  A    I didn't even know they were tipping the
2  house mom.  That's new to me.
3  Q    Well, how is the house mom making money?
4  A    She's on my payroll.
5  Q    All right.
6  A    She's an employee.
7  Q    And what does the house mom make each --
8  A    I have no clue.
9  Q    Okay.
10 A    Like I said, I'm only here in Atlanta six
11 months out of the year.  I don't -- I don't keep up
12 with it anymore.
13 Q    But you're not disputing that these tip
14 outs are made to these people, you're just saying
15 it's not required?
16 A    Not required.
17 Q    It's custom in the industry?
18 A    And there's no certain amount that
19 anybody has to pay anybody or anything like that.
20 If they don't have the money to do it, they're not
21 required to do it, so nobody makes them.
22 Q    Now, if you were a house mom, would you
23 agree with that statement?
24 A    Well, I'm not a house mom, so I don't
25 know.

---

Page 86

1      A    No.
2      Q    All right.  Do you know anything about
3   conditional certification in the Journigan case?
4      A    No.
5      Q    Do you know anything about the notice
6   process --
7      A    No.
8      Q    -- related to the Journigan case?
9      A    No.
10     Q    All right.  And do you remember all of
11  Mr. Youngelson's testimony today?
12     A    No.
13     Q    Okay.  So is it possible that if you were
14  to read his transcript, there might be things in
15  there that you would say "I don't agree with that"?
16     A    Very possible.
17     Q    All right.
18          MS. MASON:  That's all I have.
19          MR. DUDLEY:  I just have a few more
20  follow-up to that.
21          FURTHER EXAMINATION
22  BY MR. DUDLEY:
23     Q    You were here the entire deposition?
24     A    Yeah.
25     Q    And is there anything he said that stands

Page 87

1   out to you as being false in any way?
2      A    Being false?
3      Q    His testimony?
4      A    He wouldn't tell you anything false.
5      Q    All right.  That's all I'm asking.
6      A    What are you asking me, man?  No, he
7   wouldn't -- Steve's a stand up guy, man.  He is.
8      Q    And I have one more question.  Do you
9   know of any strippers that read USA Today?
10          MS. MASON:  Oh, that's insulting.
11     A    I don't even know any strippers, period.
12          MS. MASON:  I mean, come on.
13     A    I don't even know any strippers.
14  BY MR. DUDLEY:
15     Q    You don't know any strippers?
16     A    No, I don't go in there.  Don't you --
17  how many times I got to tell you guys this.  I'm
18  retired.  I live in South Carolina.
19     Q    Well, let me ask:  If the company wanted
20  to give a notice to a dancer about something --
21          MS. MASON:  Okay, this is done.  We're
22  done.
23  BY MR. DUDLEY:
24     Q    -- would you put it in USA Today to get
25  it to them?

Page 88

1      A    No, I'd probably stop by and talk to them
2   in person.
3      Q    I agree.
4          MR. DUDLEY:  All right.  We're through
5   here.
6          THE WITNESS:  Okay.  Thank you very much,
7   I think.
8          MR. DEJONKER:  Thank you very much.
9          (Deposition concluded at 5:33 p.m.)
10         (Signature not requested.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 89

1          C E R T I F I C A T E
2   STATE OF GEORGIA:
3   COUNTY OF DEKALB:
4
5          I hereby certify that the
6      foregoing transcript was taken down, as
7      stated in the caption, and the questions
8      and answers thereto were reduced to
9      typewriting under my direction; that the
10     foregoing Pages 1 through 88 represent a
11     true and correct transcript of the
12     evidence given upon said hearing, and I
13     further certify that I am not of kin or
14     counsel to the parties in the case; am not
15     in the regular employ of counsel for any
16     of said parties; nor am I in anywise
17     interested in the result of said case.
18     The witness did reserve the right
19     to read and sign the transcript.
20         This, the 22nd day of April 2019.
21
22
23     Judith L. Leitz Moran, CCR-B-2312
       Certified Court Reporter
24
25  Job No. 206

WBY vs Bell                              3)(b)(6) Surrey White                              04/11/2019

<table>
<tr><td>

Page 90

```
 1            DISCLOSURE
 2
 3        Pursuant to Article 10.B of the Rules and
      Regulations of the Board of Court Reporting of the
 4    Judicial Council of Georgia, I make the following
      disclosure:
 5
          I am a Georgia Certified Court Reporter.  I am
 6    here as a representative of IST Reporting.
 7        I am not disqualified for a relationship of
      interest under the provisions of O.C.G.A.
 8    9-11-28(c).
 9        I was contacted by the office of IST Reporting
 ·    to provide court reporting services for this
10    deposition.
11        I will not be taking this deposition under any
      contract that is prohibited by O.C.G.A. Section
12    15-14-37 (a) and (b).
13        I have no exclusive contract to provide
      reporting services with any party to the case, any
14    counsel in the case, or any reporter or reporting
      agency from whom a referral might have been made to
15    cover this deposition.
16        I will charge my usual and customary rates to
      all parties in the case, and a financial discount
17    will be given to any party to this litigation.
18
19        This, the 22nd day of April 2019.
20
21
22
          _____
          Judith L. Leitz Moran, CCR-B-2312
23        Certified Court Reporter
24
25    Job No. 206
```
</td><td>

Page 91

```
 1          DISCLOSURE OF FIRM
 2
 3        I, IST Reporting, do hereby disclose pursuant
      to Article 10.B. of the Rules and Regulations of
 4    the Board of Court Reporting of the Judicial
      Council of Georgia that IST Reporting was contacted
 5    by Bryan Cave Leighton Paisner LLP, to provide
      court reporting services for this deposition and
 6    there is no contract that is prohibited by O.C.G.A.
      15-14-37(a) and (b) or Article 7.C. of the Rules
 7    and Regulations of the Board for the taking of this
      deposition.
 8
          There is no contract to provide reporting
 9    services between IST Reporting or any person with
      whom IST Reporting has a principal and agency
10    relationship nor any attorney at law in this
      action, party to this action, party having a
11    financial interest in this action, or agent for an
      attorney at law in this action, party to this
12    action, or party having a financial interest in
      this action.  Any and all financial arrangements
13    beyond our usual and customary rates have been
      disclosed and offered to all parties.
14
15        This, the 22nd day of April 2019.
16
17
18
19
          _____
20        FIRM REPRESENTATIVE
          IST REPORTING
21
22
23
24
25    Job No. 206
```
</td></tr>
</table>