**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **LATOYA BECTON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **WBY, INC. d/b/a FOLLIES, et al.,** | ) | |
| | ) | **NO. 1:16-CV-04003-MLB** |
| **Defendants.** | ) | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendants WBY, Inc. ("WBY" or "Follies"), Steven M. Youngelson, and Surrey White (collective, "Defendants"), file this Response In Opposition to Plaintiff's Motion for Partial Summary Judgment (herein "Motion") (Dkt. 41) to avoid the unjust and atypical result Plaintiffs' Motion Seeks—an assessment of liability against Defendant, for the claims of 45 Plaintiffs, all proceeding individually (rather than collectively), before: (i) ruling on Defendants' potentially dispositive motions; or (ii) allowing Defendants the opportunity to develop the factual record, particularly where such evidence could tip the scales in Defendants' favor. Accordingly, and for the reasons more fully articulated below, Defendants respectfully request that the

Court DENY Plaintiffs' Motion in its entirety.[1]

## I.   __INTRODUCTION__

Despite two years of inactivity in this case, Plaintiffs unilaterally, and without any advance notice, moved for partial summary judgment on the issue of liability based on estoppel tied to an order that is also 8 months old.[2] Discovery has not commenced in this matter. Rather, the parties are waiting for the Court's ruling on Defendants' pending Motions to Dismiss. As shown below, courts strongly disfavor ruling on motions for summary judgment filed prior to the opening of discovery, and before any other potentially dispositive motions have been ruled on. Plaintiffs' Motion should be denied on those grounds alone.

This Court should also deny Plaintiffs' Motion because the law is clear that the collateral estoppel should not apply where there is a "significant likelihood of substantial unfairness to Defendants." Even based on the limited evidence known at this stage, there is a meaningful amount of testimony rebutting many of the facts

---

[1] In the alternative, Defendants are filing a Rule 56(d) Motion to Deny or Defer Plaintiffs' Motion for Partial Summary Judgment, showing this Court that, at minimum, Defendants should be given the opportunity to obtain and introduce additional evidence to defend against liability and to preclude applying offensive collateral estoppel in this case. Defendants incorporate by reference Defendants' Rule 56(d) Motion and supporting documents as if fully set forth herein.

[2] *See* January 28, 2019 Order Granting Partial Motion for Summary Judgment, *Hurst v. WBY, et al.,* Civ. 1:2015-cv-03560-MLB (N.D. Ga.)(Dkt. 110) ("*Hurst* Order" or "PSJ Order").

50518674;1

upon which the Court relied in the *Hurst* Order. These new facts could affect the ultimate issue of liability by shifting the balance of the six-factor economic realities test in Defendants' favor; or at least indicate that if Defendants were allowed the opportunity to conduct liability discovery, they could possibly defeat summary judgment in this case. Applying the prior judgment in *Hurst*—a single plaintiff case—to this lawsuit, with over 40 Plaintiffs, is <u>particularly</u> unfair when considering the fact-intensive nature of FLSA misclassification cases.

Additionally, this Court should reject offensive use of collateral estoppel because the Plaintiffs in this case ("Becton Plaintiffs") knew about the *Hurst* action, but failed to join that case. Courts have repeatedly refused to apply offensive collateral estoppel in factually similar cases, because it incentivizes the "free rider" problem— where plaintiffs wait to seek judgment against a particular defendant until another plaintiff successfully establishes liability, rather than joining that action; which inevitably results in increased, and unnecessary litigation. perfectly illustrate the "free rider" problem that the Supreme Court warned about in *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331 (1979). Rather than join any of the prior lawsuits filed against Defendants involving the same misclassification issues, Plaintiffs waited to file yet another lawsuit, just so they could ride the coattails of the single-Plaintiff decision in the *Hurst* case which they knew would be decided

before their lawsuit.  If they truly believed their case was the same as Ms. Hurst's, they should have just joined that action, particularly since discovery had just commenced in *Hurst* the month before they filed their Complaint. *Compare* Dkt. 1 (filed Oct. 26, 2016) *with* docket in *Hurst v. WBY, et al.*, Civ. 15-cv-03560 (N.D. Ga.), at Dkt Nos. 40-45 (filed Sept. 7, 2016). This case presents the exact increase in litigation that federal courts strive to prevent.  For these reasons, Court should reject offensive use of collateral estoppel or allow Defendants to obtain additional discovery pursuant to Defendant's concurrently filed Rule 56(d) Motion so that it has the opportunity to develop the factual record.

## II.    PROCEDURAL AND FACTUAL BACKGROUND

### A.    The Prior FLSA Lawsuits the Bankruptcy Proceeding.

Plaintiffs acknowledge that this action is among a handful of FLSA misclassification lawsuits filed against Defendants in District Court. (Dkt. 41 at FN 4.) The first lawsuit filed against Defendants was *Journigan v. WBY Inc.*, No. 1:14-cv-00913-SCJ, and was conditionally certified as a collective action. The second and third lawsuit were *Hart v. WBY, Inc.*, No., 1:15-cv-0067 (filed in January 2015; dismissed in July 2015), and *Hurst v. WBY, Inc.*, No. 1:15-cv-13560 (filed in October 2015). Out of these three lawsuits, only the *Hurst* litigation remains pending, with all but two of the *Journigan* litigants settling their claims *vis a vis* the confirmed

Bankruptcy Plan in August 2016 (*see* Bankruptcy Dkt. 123). The chart attached as Exhibit A demonstrates the procedural posture of the *Journigan*, *Hurst, Becton,* and *In re: WBY Bankruptcy* matters during the salient timeframe, and up to the Becton Plaintiffs filing the present action.

As shown therein, the first *Becton* Proofs of Claim were filed in the bankruptcy one week after the Bankruptcy Order lifting the Stay and identifying the *Journigan* and *Hurst* FLSA actions by name. This Order was the most recent entry in the docket, and Ms. Hurst and all of the *Journigan* Claimants, including Ms. Barker, had filed Proofs of Claims in the bankruptcy claims register by that time. Therefore, at the time the first *Becton* Claimants filed proofs of claim, they had judicial notice of both the *Hurst* and *Journigan* matters. Moreover, the first depositions conducted in *Hurst* matter did not occur until Feb. 15-17, 2017, nearly four months after they filed their Complaint. (*See Hurst* Dkt. Nos. 77-80, 87).  Most tellingly, Plaintiffs' counsels' fee statements, filed in the Bankruptcy action, establish Plaintiffs' counsel's knowledge of the Hurst action as early as May 2016[3] and that

---

[3] *See* Creditors' Estimation Ex. 29, attached hereto as Ex. B:

- May 1, 2016 (first entry on Plaintiffs' counsel's time records): "Reviewed Hurst, Payne, and Journigan complaints and files and reviewed Bankruptcy pleadings."

- September 11, 2016: Reviewed Hurst objections to settlement and telephone

Plaintiffs' counsel was working in concert with Hurst's counsel no later than September 2016. [4]   Despite these time entries, Plaintiffs' counsel offers no explanation of why his clients did not seek to join Ms. Hurst's action before deciding to file their own.

### B.   The Filing of the Post-*Hurst* Lawsuits and Pending Motions to Dismiss.

On October 26, 2016, the Becton Plaintiffs filed the instant action—the fourth lawsuit against Defendants—five months after initially filing their proof of claims. (Dkt. 1.)  In May 2017, Defendants filed a Motion to Dismiss (in part) Plaintiff's Complaint on grounds that it contained allegations of potentially time-barred claims,

---

conference with [Hurst's counsel] re same…

- October 30, 2016: Reviewed Hurst discovery responses and documents and file.

- October 31, 2016: Reviewed Hurst and Payne District Court files to determine address for service and initial summons.

- February 16, 2017: Attempt attendance at Hurst 30(b)(6) deposition.

- February 18, 2017: Reviewed Hurst depositions.

- February 20, 2017: Reviewed Youngelson and White deposition transcripts (from Hurst matter).

[4] That Barker Plaintiffs' counsel had these transcripts less than a week after they were taken shows how closely he worked and the coordination of efforts between Plaintiffs' counsel in *Becton* and Plaintiffs' counsel in *Hurst*. *See* FN 5, *supra*, at February 20, 2017 entry.

and that the Becton Plaintiffs' theory to recover "tip-outs" was not a legally cognizable claim. (Dkt. 21.) In response, the Becton Plaintiffs filed an Amended Complaint. (Dkt. 22.) In June 2017, Defendants moved to dismiss the Amended Complaint in its entirety because it was devoid of key allegations such as the alleged dates of employment. (Dkt. 32.) Plaintiffs then filed a Motion for Leave to file a Second Amended Complaint, (Dkt. 34), which Defendants opposed. (Dkt. 36.)

These motions all remain pending before this Court. As a result, the parties have not submitted a joint preliminary plan for discovery, and no scheduling order has been issued on this matter. (Mason Dec. ¶¶ 13-14.) Until Plaintiffs' Motion for Partial Summary Judgment, there have been no substantive filings by either party since August 2017.

## C. Order Granting Summary Judgment in *Hurst* Litigation.

On January 28, 2019, this Court in *Hurst* granted summary judgment in favor of Ms. Hurst, primarily finding that she was an employee and owed minimum wage under the FLSA (the "PSJ Order"). [5] In doing so, this Court relied on Ms. Hurst's testimony that:

1. She was required to use the valet and turn over her car keys (PSJ Order, Dkt. 110, at p. 9 );

---

[5] The Court also made other findings regarding offset, FLSA enterprise coverage, and other ancillary issues. (*See generally* PSJ Order, Hurst Dkt. 110.)

2. She was required to purchase and sell drink tickets to customers (*Id.*);

3. Most of her income derived from table dances (*Id.* at 10);

4. She was not permitted to deviate from the minimum price set for dances (*Id.*);

5. She was not free to leave Follies once she arrived to work (*Id.* at 11);

6. She was required to take a breathalyzer test before being given a "See Ya Pass" to leave the club (*Id.* at 11, 13-14)

7. She was charged or fined for leaving the club early (*Id.* at 9);

8. Follies controlled every aspect of the facility, including the music selection (*Id.* at 22);

9. Follies, not her, controlled marketing and advertising (*Id.* at 22-23);

10. She did not significantly invest in her job as an entertainer in comparison to Follies' cost to operate the club (*Id.* at 23); and

11. She worked 98 shifts in a six month period (*Id.* at 28-29).

These facts were relevant to each of the six factors of the economic realities test. (*Id.* at pp. 1-33.) Although Defendants had collected sworn statements from several entertainers that refute some of these key facts (Mason Dec. at ¶¶ 24, 26)[6], this Court in *Hurst* did not consider this testimony because these entertainers were disclosed too late in discovery. (*Id.* at. ¶ 25; PSJ Order, Hurst Dkt. 110, at FN 6.)

The Court also found that Steve Youngelson and Surrey White ("Individual Defendants") were "joint employers" based on their deposition testimony from 2017.

---

[6] Declaration of Erica V. Mason is attached hereto as Exhibit J.

### D.  <u>Limited Discovery in the Bankruptcy Proceeding.</u>

Since the filing of this lawsuit, Defendants, the Becton Plaintiffs, and Ms. Barker have engaged in limited bankruptcy-related discovery. (Mason Dec. at ¶¶ 6-7.) However, discovery in the bankruptcy was strictly limited to discrete issues pertaining to the Bankruptcy Proceeding, such as the estimation of value of claims, the release of claims, and/or the modification of the bankruptcy plan.[7] (*Id.* at ¶ 6.) In fact, counsel for the Becton Plaintiffs repeatedly objected to any questions that might also be relevant to FLSA liability.[8]

Although this discovery was focused on bankruptcy-related issues, some of the testimony elicited demonstrated facts rebutting some of the factors that the Court

---

[7] By way of background, the Hon. Bankruptcy District Court Judge Sacca allowed the parties to conduct limited discovery related to: (i) Debtor's Motion For Estimation, which seeks the Court's estimation of the value of the claims that remain in the Bankruptcy action for purposes of funding the bankruptcy escrow account damages (and for which Plaintiffs' counsel provided the above testimony part of his evidence in support of his request for fees incurred and estimated future fees); (ii) Debtor's Motion to Modify the Bankruptcy Plan, which sought a ruling on, or equitable relief related to, the ability the Plaintiffs who settled their bankruptcy proofs of claim to proceed with their claims against the individual owner Defendants; and/or (iii) various other bankruptcy issues, all of which are unrelated to the District Court's liability determination. *See generally* Docket for *In re: WBY, Inc.*, Case No. 16-52291-JRS (Bankr. N.D. Ga. 2016).

[8] "I thought you were taking a deposition here today limiting the scope of the inquiry into the motion to modify and not the cause of action, and I don't want to get into that." (Goddard Dep. 12:21-25, 13:1-22; *see also* Barker Dep. 62:18-20, excerpts collectively attached as Ex. C.)

relied upon as "undisputed testimony" when granting Plaintiff Hurst's Partial Motion for Summary Judgment Follies—evidence that was not available to the Court at the time it ruled on Plaintiff's Hurst's Motion, but would have to be given significant weight (given that it is the entertainers' own admissions) when ruling on the *Becton* and *Barker* Plaintiffs' Motions for Summary Judgment for alleged FLSA Misclassification,  For example, Ms. Hurst testified in the *Hurst* litigation that Defendants required her to valet park her car for a fee whenever she performed at WBY. Plaintiff Sacdalan (from this action) testified regarding valet parking:

> Q: "And if you got [to Follies] typically around noon, according to these records, was the valet parking company there?
> A: "No, not during the daytime."
> Q: "Okay. Did you pay a valet parking fee?"
> A:"Only when I worked at night, not during the day."

(Sacdalan Dep. 18:17-23, excerpts attached as Ex. E.)

Similarly, Plaintiff Brooks (from this action) testified:

> Q: "…So it was cheaper for you to drive and pay valet parking fee than to take a taxi or anything else?"
> A: "Yes."
> Q: "But that's each entertainer's choice whether they want to drive to work or not?"
> A: "Yes."
> Q: "..And did you ever look at other parking options other than parking where it(sic) was a valet parking fee?"
> A: No.

(Brooks Dep. 60:22-61:7, excerpts attached as Ex. E.) At least one of the *Becton*

Plaintiffs testified that she primarily used Uber or another car service to get to

Follies, and thus did not even use valet at Follies.[9] Since this testimony occurred after the PSJ Order, it was not considered by this Court when ruling on *Hurst's* Partial Motion for Summary Judgment.

Plaintiff Hurst testified Defendant WBY required that she take a breathalyzer test every time she performed and would not be allowed to receive a *"See Ya Pass"* (to leave) without passing this test. The Court cited this in the *Hurst* PSJ Order when identifying factors that weighed in favor of Plaintiff Hurst's "employee" status. (*See* PSJ Order, *Hurst* Dkt.110, at pp. 11, 13-14).

By contrast, Defendants presented evidence during the bankruptcy estimation hearing in May 2019 regarding WBY's limited use of the breathalyzer machines at Follies. *See* excerpts of Hearing Transcript attached as Ex. F; *see also Bankruptcy*. Dkt. 633.[10] Specifically, Edward Vasques, the vendor for WBY's breathalyzer machines, testified about the weekly test count records he maintains for the machines and the validity of those counts as business records. (*See* Ex. F, at 163:16-164:20.).

---

[9] Q: "And how did you typically get to Follies?  A: "…I sometimes drove but usually took an Uber or something like that." (Plaintiff Kang (from this action)  Dep. 11:6-9, excerpts attached as Ex. E.)

[10] Unlike Plaintiff Hurst, the *Becton* Plaintiff seek the recovery of their breathalyzer costs and is requesting that the Bankruptcy Court to include several thousand dollars in the Bankruptcy escrow for those amounts.  It was for this reason that Defendants began searching for discovery to refute this issue which, before the Court's ruling in *Hurst*, they were unaware would be afforded such weight.

Based on his business records, 160 breathalyzer tests were being administered each week during the period of March 26, 2018 through April 30, 2019 and before that point, when WBY was allowed under city ordinance to stay open several hours later each week, approximately 250 breathalyzer tests were conducted each week. (*Id.* at 164:24-66:10.) Even calculating the percentages using the numbers most favorable to Plaintiffs, the evidence indicates that, prior to March 2018, only 45% of entertainers were taking a breathalyzer test; and after March 2018, this average drops to about 29%.[11] This evidence undercuts Ms. Hurst's testimony that breathalyzers were <u>always</u> required or that WBY would not give her a "See Ya Pass" until she passed a breathalyzer test. (*See Hurst* Dkt. 110, at pp. 11-14).

Last, there is evidence that White and Youngelson may no longer be as sufficiently involved in WBY's business operations as would be necessary to hold

---

[11] The Court in *Hurst* noted that between 80 and 100 entertainers performed at Follies in any given **night** of the week. (PSJ Order, *Hurst* Dkt. 110, at p. 32; *see also* Shine Dep. 21:5-14 attached as Ex. G.)  WBY General Manager Shine further testified that Follies was open seven days a week—Monday through Sunday. (Shine Dep. at 68:7-13.) Therefore, approximately between 560 and 700 entertainers were working at Follies in a given week, yet, based on the breathalyzer records, only between 160 to 250 tests were administered during the relevant time period. For the period before March 2018, percentage calculated assuming the lowest estimate of entertainers performing at Follies each week, 560, and dividing it by Vasques' estimate of 250 tests a week: $250 \div 560 = 0.446$ or 44.6%. For post-March 2018, percentage calculated assuming the lowest estimate of entertainers performing at Follies each week 560, and dividing it by the highest estimate of 160 test a week: $160 \div 560 = .285$ or 28.5%.

them liable as "employers" under the FLSA.  Both recently testified to becoming less involved in the last few years. (*See* Ex. J, White Dep. 37:25-38:12, 87:16-19; Youngelson Dep. 38:9-11, 127:2-3). Since the alleged relevant time period in this case (June 2015 to June 2018) falls outside the relevant time period in *Hurst* (who stopped performing at Follies in April 2014), it would be unfair to estop Individual Defendants from defending against liability as joint employers when it might not have been the case during the time Plaintiffs allegedly worked at Follies.

As this Court is aware, Defendants also collected sworn statements from several entertainers that refute much of the unrebutted testimony from Ms. Hurst, such as that entertainers: (1) were free to charge certain amounts for table and VIP dances; (2) were not required to follow any work rules set by Follies management; (3) were not fined or charged a higher house fee for leaving the club early; (4) were allowed to pick the music at the club and otherwise controlled the manner in which they performed at Follies; (5) advertised and marketed their services on social media; and (6) worked at Follies sporadically rather than a continuous period. (Mason Dec. ¶¶24-26; *see generally* Flournoy Dec. attached as Ex. H; Herbst Dec. attached as Ex. I.)

Tellingly, Plaintiffs fail to acknowledge any of this discovery in the record in its Motion for estoppel-based Summary Judgment even though it clearly

demonstrates that collateral estoppel should not apply in this case. Defendants rely on this evidence as a sufficient basis to defeat Plaintiffs' Motion based on estoppel. But if it is not sufficient, Defendant believes that it can develop numerous additional examples of the factually-distinguishable evidence if the Court were to grant Defendant's concurrently-filed FRCP 56(d) Motion. At a minimum, this Court should deny or postpone Plaintiffs' Motion until Defendants have had the opportunity to develop such rebuttal evidence.

## III.   ARGUMENT AND CITATION OF AUTHORITY

### A.   Plaintiffs' Motion is Premature.

Courts generally disfavor motions for summary judgment made at an early stage of litigation—especially those that are filed before any discovery has taken place. *See Rodgers v. Global Prophets, Inc.*, No. 09-80753-CIV, 2009 WL 3288130 (S.D. Fla. 2009). Although "[f]iling a Rule 56 motion at the outset of a case (before the commencement of discovery) is not forbidden under the Federal Rules of Civil Procedure; …it is **procedurally suspect**, or at **least discouraged**." *Sideraulic System SPA v. Briese Schiffahrts*, No. 10-0715-WS-M, 2011 WL 3204521, *3 (S.D. Ala July 26, 2011)(emphasis added). As a result, many courts deny motions for summary judgment filed at the outset of the litigation. *Id.* (collecting cases). *See also AICON 58018 Corp., v. King Ocean Servs. Ltd.,* No. 17-cv-61513-WPD, 2018 WL

6514902 (S.D. Fla. Jan. 11, 2018). A summary judgment motion filed while a motion to dismiss are pending, and before a defendant has even answered the Complaint, is likewise disfavored and viewed as premature. *See Blumel v. Mylander,* 919 F.Supp. 423, 429 (M.D. Fla. 1996).

Given the procedural history of this case, it is clear that Plaintiffs' Motion is premature. The Becton Plaintiffs' Motion to Amend and Defendants' Motions to Dismiss are still pending, and Defendants have not yet answered any of the complaints. Because the pending motions are dispositive, they should be considered and ruled upon **first** because the resolution of those motions may moot Plaintiffs' Motion altogether.

There is also no dispute that a scheduling order has not been entered in this case, and as such, discovery has not yet commenced. Despite being in constant communication with defense counsel during the Bankruptcy Proceeding, Plaintiffs' attorney has never mentioned an intention to file a summary judgment motion based on the PSJ Order from *Hurst.* (Mason Dec. at ¶¶ 15, 17.) Neither Plaintiffs nor Defendants have filed any substantive motions or pleadings in this case since August 2017. Plaintiffs' Motion—filed nearly eight months after the PSJ Order in *Hurst*—is "tantamount to a summary judgment by ambush." *See Sideraulic,* 2011 WL 3204521 *4. On this ground alone, this Court should deny Plaintiffs' Motion as premature.

Similarly, courts disfavor ruling on a motion for summary judgment based on scant and cursory evidence. *Dagoberto v. Laundry Zone, Inc*., No. 1:15-cv-22708-KMM, 2015 WL 7890034, *2 (S.D. Fla. Dec. 4, 2015). In *Dagoberto*, the Court denied a motion for summary judgment based on only one affidavit, and where "the parties have yet to conduct any substantive discovery." *Id.* "That is **not enough** for this Court to adjudicate the merits of the case." *Id.*

Yet that is precisely what the Becton Plaintiffs are asking this Court to do. Plaintiffs' Motion is primarily based on only a three-page affidavit from an entertainer, Soraya Barker, who is not even a party in this lawsuit. (*See generally* Dkt. 41.) Plaintiffs attempt to use Barker's testimony to draw sweeping conclusions about the work environment at Follies during an entire seven year period. (*Id.*) For example, Barker states in her Declaration that "the policies and procedures applicable to entertainers at Follies has not significantly changed since 2012." (Dkt. 41-4 at 2.) This is entirely conclusory, and, like in *Dagoberto*, not enough for this Court to adjudicate on the merits, especially without the benefit of Defendants cross-examining Barker. This is particularly true where, as here, there are serious questions about the credibility of Barker's declaration testimony, given that it appears to be largely a direct cut and paste job from a declaration filed by Plaintiffs' counsel in an unrelated entertainer case. (*See* Dkt. 41-4 at 3)(including references to "Pink Pony.")

16

Although there has been some limited discovery conducted in the Bankruptcy Proceeding, the record evidence is not sufficient. As mentioned above, the discovery in the Bankruptcy Proceeding was limited to discrete bankruptcy issues. (Mason Dec. at ¶ 6.)  Defendants were not permitted to ask the Becton Plaintiffs questions that related to the FLSA six-factor test without drawing an objection from Plaintiffs' counsel. (*See* Mason Dec. at ¶ 7; *see also* excerpts in Ex. C). For this reason, the fact that the Barker Plaintiffs moved for summary judgment—knowing full well that Defendants were deprived of obtaining this evidence, while simultaneously failing to cite any of the evidence obtained in the Bankruptcy that is unfavorable to their estoppel argument—is particularly suspect and reeks of gamesmanship. Thus, as laid out in Defendants' Rule 56(d) Motion, should this Court decide not to deny Plaintiffs' Motion outright, Defendants respectfully request that this Court first rule on all previously-pending full or partial dispositive motions, then allow Defendants to engage in discovery on the FLSA liability factors so that it can present a full and fair discovery record to the Court, before it rules on Plaintiffs' Motion.

**B.    Applying Offensive Collateral Estoppel is Unfair to Defendants Because the Outcome May Be Different in This Case.**

The application of collateral estoppel is committed to the sound discretion of the district court. *See Parklane Hosiery Co. v. Shore*, 439 U.S. at 331. "That discretion is not unlimited..." *Deweese v. Town of Palm Beach*, 688 F.2d 731, 734

(11th Cir. 1982). "Where there is a significant likelihood of substantial unfairness, application of offensive collateral estoppel constitutes an abuse of discretion." *Id.*

Applying offensive collateral estoppel is unfair to a defendant when the facts of the current case could result in a different outcome than the prior action. *See e.g. Berry v. Great American Dream, Inc.*, No. 13-cv-3297-TWT, 2014 WL 5822691 (N.D. Ga. Nov. 10, 2014). For example, the court in *Berry* ultimately determined that applying offensive collateral estoppel was not unfair to the defendant in part because the night club had **not** shown that the current case would yield a different result from the prior action. *Id.*

Unlike in *Berry*, it would be unfair to apply offensive collateral estoppel here because the evidence available thus far indicates that the facts in this case are materially different from the facts in *Hurst*, which could affect this Court's analysis under the FLSA six-factor test.

Defendants now have the opportunity to disclose this testimony early enough in discovery, so that this Court may weigh it against the Plaintiffs' testimony under the six factors of the economic realities test. This testimony, along with many declarations like them should shift the balance of the economic realities test in Defendants favor. (*See* Defs.' Supp. Initial Disclosures Witness List, *Hurst* Dkt. 69, at pp. 12-13). While Defendants were precluded from relying on that testimony in

18

*Hurst* (PSJ Order, Hurst Dkt. 110, at FN 6), they would not be so precluded here. If this Court is inclined to grant Plaintiffs' estoppel-based summary judgment now, without affording Defendants additional discovery, Defendants request that this Court take judicial notice of, and review, the declarations which were filed directly with chambers as instructed, rather than on the docket, at or around the time of the discovery dispute about which this Court conducted a telephonic hearing on February 21, 2017. (*See Hurst* Dkt. 75). Even if this evidence does not lead this Court to conclude that the Becton Plaintiffs are independent contractors, it should at the very least create a genuine dispute of material fact, which would entitle Defendants to a jury trial on the question of liability.

In addition to prior testimony from entertainers in the *Journigan* action, there is also new evidence regarding the alleged mandatory valet parking and breathalyzer requirements (*See* Exs. E-F, and J), and the Individual Defendants' involvement in Defendant WBY's daily operations. This evidence also rebuts statements relied upon as undisputed in the *Hurst* Order. In sum, the prior testimony from non-litigant entertainers, combined with new entertainer testimony, vendor testimony, and the Individual Defendants' testimony, all demonstrate that applying offensive collateral estoppel would be unfair to Defendants.

**C.**   **The Court Should Decline To Apply Offensive Collateral Estoppel Because the Becton Plaintiffs Did Not Join the *Hurst* Action, Despite Their Early Knowledge Of That Case.**

Plaintiffs acknowledge that this "Court may refuse to apply the [collateral estoppel] doctrine if plaintiff could have joined the earlier action." (Dkt. 41 at fn. 5.) Indeed, the U.S. Supreme Court in *Parklane Hosiery Co., Inc. v. Shore*—while upholding the use of offensive collateral estoppel—stated that "[t]he general rule should be that in cases where a plaintiff could have easily **joined in the earlier action**…, a trial judge **should not allow** the use of offensive collateral estoppel." 439 U.S. 322, 331 (1979)(emphasis added).

> Defensive use of collateral estoppel precludes a plaintiff from relitigating identical issues by merely 'switching adversaries. Thus defensive collateral estoppel gives a plaintiff a strong incentive to join all potential defendants in the first action if possible. **Offensive use of collateral estoppel, on the other hand, creates precisely the opposite incentive.** Since a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if defendant wins, the plaintiff has every incentive to adopt a **'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment**. Thus offensive use of collateral estoppel will **likely increase rather than decrease the total amount of litigation,** since potential plaintiffs will have everything to gain and nothing to lose by not intervening in the first action.

*Id.* at 329-330 (emphasis added).

The Eleventh Circuit Court of Appeals also acknowledged that the "availability of the doctrine creates a **'free rider' problem** by encouraging potential

plaintiffs to wait on the sidelines until another plaintiff successfully establishes liability." *Deweese v. Town of Palm Beach*, 688 F.2d 731, 733 (11th Cir. 1982)(emphasis added). "[T]he doctrine discourages plaintiffs from joining in a single action and thereby results in increased litigation." *Id.*

Whether a plaintiff could have joined in an earlier suit should be considered before applying offensive collateral estoppel in a particular case. *See Collins v. Seaboard Coastline R. Co.*, 681 F.2d 1333,1336 (11th Cir. 1982)(reversing and remanding a case where the trial court's decision to apply offensive collateral estoppel failed to consider the plaintiff's "motivation" for not joining the prior action). For example, in *Parklane*, the Supreme Court determined that applying offensive collateral estoppel was appropriate in that case because it would "not here reward a private plaintiff who could have joined in the previous action…" *Id.* Specifically, the earlier action in *Parklane* was a lawsuit brought by the SEC, and joining private action to an SEC suit was prohibited by a federal statute. *Id.* at fn. 17. Even in *Berry v. Great American Dream, Inc.*, the District Court for the Northern District of Georgia first considered whether there was evidence that the two plaintiffs in *Berry* could have joined the earlier action. 2014 WL 5822691 at *1.

Evidence that a plaintiff was **aware** of the earlier action precludes applying collateral estoppel. *See Charles J. Arndt, Inc. v. City of Birmingham*, 748 F.2d 1486

(11th Cir. 1984). In *Charles*, the plaintiff appealed a trial court's decision refusing to apply the doctrine of offensive collateral estoppel to the Eleventh Circuit Court of Appeals. *Id.* at 1494. The Eleventh Circuit looked to the evidence in the record, which revealed that the plaintiff was a witness in the prior action against the defendant. *Id.* Based on this evidence, the Court determined "that [the plaintiff] was **aware of the ongoing litigation** between the [defendant] and [the former plaintiff]." *Id.* As a result, the Eleventh Circuit affirmed the trial court's decision denying the application of the doctrine. *Id.* at 1494-95. "To countenance such practice so that [the plaintiff] could now use the decision in the [earlier] case against the defendants would serve only to promote the 'wait and see' attitude disapproved by the Court in *Parklane*." *Id.* Similarly, the Court in *Berry* applied offensive collateral estoppel because the night club had "failed to provide or point to any evidence that conflicts with or **undermines Plaintiffs' sworn testimony, or that creates a genuine issue of material fact as to whether Plaintiffs were aware** of the [earlier] litigation before they filed their complaint in this action." Id. at *8 (emphasis added).

Here, there is evidence—particularly Plaintiffs' counsel's time entries—that show the Becton Plaintiffs were well aware of the ongoing litigation against Defendants. (*See* Ex. B.) These time records also shows that Plaintiffs had an **opportunity** to join the *Hurst* litigation. Fifteen of the 44 Becton Plaintiffs,

including Plaintiff Becton herself, filed proofs of claims in the Bankruptcy by May 2016, well before the Scheduling Order was entered in the *Hurst* litigation. (*See* Bankruptcy Dkt. Claims Register, Nos. 79-86).

This evidence shows that the Becton Plaintiffs were aware of the *Hurst* litigation—which under the reasoning in *Charles* and *Berry* should be sufficient to preclude offensive collateral estoppel. More than half the Plaintiffs (24 of them) filed proof of claims **before** the deadline to amend pleadings or add parties expired in the *Hurst*. (*See Hurst* Dkt. 36.) Therefore, the Becton Plaintiffs became aware of the *Hurst* action early enough to have joined as additional plaintiffs, yet did not do so.

Notably, the Scheduling Order in Hurst did not even set a deadline to add parties. (*Id.*) In fact, Federal Rule 20 of Civil Procedure would have allowed this Court to add more plaintiffs in the Hurst litigation as permissive joinders, and the Becton Plaintiffs joining at that juncture would not have prejudiced any of the parties in *Hurst* since it was only the beginning of discovery. Nothing about the procedural posture of the Hurst action would have precluded the Becton Plaintiffs from joining.

The Becton Plaintiffs, in turn, fail to offer any sworn testimony as to why they could not join the *Hurst* action. Instead, the Becton Plaintiffs only state in their briefing that the *Hurst* litigation was not a collection action. (Dkt. 41 at fn. 5.) However, this case is also not a collective action, (nor has there even been any

23

motion to certify it as one), so this purported reason does nothing to explain why the Becton Plaintiffs could not join as additional plaintiffs in *Hurst*. [12] Because the evidence shows that the Becton Plaintiffs could have joined the *Hurst* action, this Court should not apply offensive collateral estoppel.

Indeed, applying estoppel to this case would only encourage the "free rider" problem and would set a dangerous precedent in FLSA litigation by allowing the Becton Plaintiffs to use a single-plaintiff case to estop Defendants from defending fact-intensive claims involving 44 different individuals. This would incentivize potential plaintiffs in FLSA cases to minimize litigation costs by first filing a single-plaintiff case to test the legal merits in court. Then, if successful, a multitude of plaintiffs—having observed the success of the first single-plaintiff action—would file consecutive collective action cases seeking an estoppel ruling in the class' favor, based on the assertions of two individuals—the former single-action plaintiff and the named plaintiff in the current action.

The litigation history against Defendants already proves this point. Though there has been three prior lawsuits against Defendants involving the same misclassification issues with respect to entertainers, the 44 Plaintiffs here waited to

---

[12] Alternatively, more evidence is needed regarding Plaintiffs' reason for not joining the *Hurst* action. For this reason, Defendants have also filed a motion for discovery pursuant to Federal Rule 56(d), as set forth in Defendants separately-filed Motion.

file a fourth lawsuit, with the same counsel representing yet another set of entertainers (17 entertainers) in a fifth multi-plaintiff lawsuit. This case presents the exact increase in litigation that federal courts strive to prevent. Therefore, this Court should refuse to apply offensive collateral estoppel in this case.

## IV.   **CONCLUSION**

To apply a judgment in a single-plaintiff case to one that involves over 40 plaintiffs, without the benefit of any discovery, and based only on a barebones affidavit, would be unfair as it would deprive Defendants—in a sweeping fashion—of its right to a full and fair defense. This Court should also not apply offensive collateral estoppel as a matter of judicial economy. The Becton Plaintiffs were aware of the *Hurst* litigation and had an opportunity to join the case, but failed to do so. Instead, the Becton Plaintiffs sat back while the parties in *Hurst* engaged in discovery and incurred the costs of litigation. Now, the Becton Plaintiffs request this Court to reward that behavior by granting summary judgment in their favor on the issue of liability. This Court should not condone this practice, which has already led to an increase in litigation—with the potential for more. Defendants respectfully request that this Court deny Plaintiffs' Motion.

Respectfully submitted, this 17th day of October, 2019.

AKERMAN, LLP

50518674;1

/s/ Erica V. Mason
Erica V. Mason
Georgia Bar No. 141986
Ana C. Dowell
Georgia Bar No. 343780
erica.mason@akerman.com
ana.dowell@akerman.com
999 Peachtree St., NE, Suite 540
Atlanta, Georgia 30309
Telephone:          404-733-9808
Facsimile: 404-733-9908
*Counsel for Defendants*

26

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **LATOYA BECTON, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION** |
| **WBY, INC. d/b/a FOLLIES, et al.,** | ) | **NO. 1:16-CV- 04003-MLB** |
| | ) | |
| **Defendants.** | ) | |

## CERTIFICATE OF SERVICE AND COMPLIANCE

I hereby certify that the foregoing has been prepared using Times New Roman 14 point font, and that I have this date served a copy of the foregoing on opposing counsel by electronically filing same using the CM/ECF system which will automatically send email notification of such filing to the attorney(s) of record for Plaintiffs.

This 17th day of October, 2019.

*s/ Erica V. Mason*
Erica V. Mason

*Counsel for Defendants*

27

50518674;1